**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Craten, et al., | No. CV-15-02587-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Foster Poultry Farms Incorporated, | |
| Defendant. | |

In 2013, then 17 month-old Plaintiff N.C. contracted salmonellosis and subsequently experienced severe complications. N.C.'s parents, Plaintiffs James and Amanda Craten, believe N.C's illness was caused by raw chicken processed by Defendant Foster Poultry Farms Incorporated ("Foster Farms"). The Cratens bring this case individually and on behalf of N.C., alleging negligence, strict liability, and breach of the implied warranty of merchantability claims against Foster Farms. (Doc. 223.) At issue is Foster Farms' motion for summary judgment. (Doc. 137.) The motion is fully briefed and the Court heard oral argument on December 19, 2017. (Docs. 181, 193, 236.) For the following reasons, the Court grants summary judgment for Foster Farms on the Cratens' strict liability and implied warranty claims, but denies summary judgment on the Cratens' negligence claims to the extent they are based on duties that parallel federal law.

**I. Background**

Salmonella is found in a number of sources, including chicken, beef, produce, and

eggs. The bacteria are natural to raw poultry, but killed by proper cooking. Nonetheless, the Centers for Disease Control ("CDC") estimates that approximately one million Salmonella infections occur in the United States annually.

In 2013, the CDC observed an increase in the number of reported Salmonella-related illnesses. The CDC eventually declared an outbreak and attributed some of the increased infections to raw chicken processed at Foster Farms' three California facilities. Seven specific strains of Salmonella Heidelberg were linked to the Foster Farms outbreak, but because several of those strains had been reported to the CDC both before and since the outbreak, the CDC acknowledged that not all illnesses from those strains necessarily were caused by consumption of or exposure to raw chicken processed at the three California Foster Farms facilities. Instead, some might have been part of the preexisting baseline of annual reported Salmonella infections.

N.C. became ill in late September or early October 2013. He ultimately was diagnosed with Salmonella Heidelberg PFGE pattern JF6X01.0041, a less common antibiotic-resistant strain of the bacteria, which was among those linked to the Foster Farms outbreak.[1] The Cratens do not know the specific food product that caused N.C.'s illness, nor do they know the precise meal or who prepared it. In fact, the Cratens do not know whether N.C. actually ate Foster Farms chicken in the days leading up to his illness. The Cratens reported that N.C. might have eaten any of several brands of chicken other than Foster Farms during the week before he became sick, and that he ate a number of foods other than chicken that also can contain Salmonella. Further, the Cratens' available shopping records during the relevant time period reveal no purchases of raw Foster Farms chicken products. Nonetheless, the Cratens believe it is more likely than not that N.C. contracted salmonellosis from raw chicken products associated with the Foster Farms outbreak because of the timing of N.C.'s illness, the relatively less common strain of Salmonella Heidelberg with which he became infected, and Foster Farms'

---

[1] "PFGE" is an acronym for pulse-field gel electrophoresis, a laboratory technique to produce a DNA fingerprint for a bacterial isolate. JF6X01.0041 refers to the specific strain of Salmonella Heidelberg.

history of problems with Salmonella Heidelberg at its California facilities, which undisputedly could have distributed raw chicken to Arizona grocers at which the Cratens regularly shopped.

Accordingly, the Cratens brought this lawsuit against Foster Farms in December 2015, alleging five counts. (Doc. 223.) The first and second counts seek to hold Foster Farms strictly liable for manufacturing a defective product and failing to adequately warn and instruct consumers. The third alleges that Foster Farms breached the implied warranty of merchantability because the raw chicken associated with the outbreak was not fit for the ordinary purpose for which the product was intended. Counts IV and V, though pled separately, allege a claim for negligence under both traditional and negligence per se theories.[2] The Cratens claim that Foster Farms breached certain duties of care in the production process imposed by state and federal law meant to control the presence of pathogens like Salmonella.

## II. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment "bears the initial

---

[2] Negligence per se is not a cause of action separate from common law negligence. It is a doctrine under which a plaintiff can establish the duty and breach elements of a negligence claim based on a violation of a statute that supplies the relevant duty of care. *See Williams v. City of Mesa*, No. CV-09-1511-PHX-LOA, 2011 WL 836856, at *14 n.13 (D. Ariz. Mar. 9, 2011).

- 3 -

responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id*. at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted).

### III. Discussion

Foster Farms argues that it is entitled to summary judgment on all counts because (1) the Cratens' claims are preempted by the Poultry Products Inspection Act ("PPIA") and (2) the Cratens cannot prove that Foster Farms raw chicken caused N.C.'s illness. Alternatively, Foster Farms argues that it is entitled to partial summary judgment on the Cratens' strict liability and breach of implied warranty claims because Salmonella is natural to raw poultry, the United States Department of Agriculture ("USDA") is responsible for the mandatory warning and instruction labels affixed to raw chicken, and Foster Farms' raw chicken is safe for its intended use (i.e., safe when properly handled and cooked). The Court addresses these arguments in turn.

#### A. Preemption

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); U.S. Const. Art. VI, cl. 2. When presented with a preemption question, the Court's task "is to ascertain Congress' intent in enacting the federal statute at issue." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983). "Congress' intent to preempt state and local law may be explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quotations and citation omitted). That is, federal preemption may be express or implied.

"Where the intent of a statutory provision that speaks expressly to the question of

preemption is at issue," the Court does "not invoke any presumption against pre-emption but instead focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Atay v. Cty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quotations and citation omitted). In the absence of an express preemption provision, however, "a state law is preempted if it actually conflicts with federal law or if federal law so thoroughly occupies a legislative field that it is unreasonable to infer that Congress intended for supplemental state or local regulation." *Id.* Thus, a "presumption against preemption" adheres to the implied preemption analysis, and the Court "assume[s] that a federal law does not preempt the states' police power absent a clear and manifest purpose of Congress." *Id.* (quotations and citation omitted).

Here, the Court is confronted with an express preemption provision contained within the PPIA, which governs poultry processors. "Congress enacted . . . the PPIA in part to prevent the interstate transfer of adulterated and misbranded . . . poultry products." *Meaunrit v. ConAgra Foods, Inc.*, No. C 09-02220 CRB, 2010 WL 2867393, at *5 (N.D. Cal. July 20, 2010); 21 U.S.C. § 452. To that end, the PPIA regulates the processing, inspection, approval, and labeling of poultry for interstate sale, and expressly preempts state laws that: (1) impose requirements with respect to premises, facilities, operations, marking, labeling, packaging, or ingredients that (2) add to or are different from those imposed by federal law. 21 U.S.C. § 467e. States may, however, impose requirements with respect to these matters that parallel those imposed by the PPIA and its related regulations. *Id.*

"Absent other indication, reference to a State's 'requirements' includes its common-law duties." *Reigel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008); *see also Gorman v. Wolpoff v. Abramson, LLP*, 584 F.3d 1147, 1171 (9th Cir. 2009). To determine whether state law claims are preempted, a court "must consider the theory of each claim and determine whether the legal duty that is the predicate of that claim is inconsistent with [federal law.]" *Metrophones Telecomm'ns, Inc. v. Global Crossing*

*Telecomm'ns, Inc.*, 423 F.3d 1056, 1075 (9th Cir. 2005) (internal quotations and citation omitted).

Foster Farms bases its preemption argument on two legal duties that are the predicates of all of the Cratens' claims, and which Foster Farms contend conflict with federal law. First, Foster Farms argues that poultry processors are authorized to sell chicken containing Salmonella because Salmonella is not an adulterant within the meaning of the PPIA. Consequently, the Cratens' state law claims are preempted because they all are based on the theory that the presence of Salmonella on the Foster Farms raw chicken associated with the 2013 outbreak rendered the chicken adulterated. Second, Foster Farms argues that the Cratens' failure to warn claim is preempted because it seeks to impose warning and labeling requirements that differ from or are in addition to the warning and instruction labels mandated by the USDA. The Court disagrees with Foster Farms' first argument, but agrees with its second.

### i. Salmonella as an Adulterant

The PPIA prohibits poultry processors from selling chicken that is adulterated, a term defined by the act in a number of ways. 21 U.S.C. §§ 453, 458. The Cratens rely on three of those definitions to support their claims. Specifically, chicken may be deemed adulterated:

> (1) if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health;
>
> . . .
>
> (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food;
>
> (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health[.]

21 U.S.C. § 453(g).

Relying on two cases—*American Public Health Association v. Butz*, 511 F.2d 331 (D.C. Cir. 1974), and *Supreme Beef Processors, Inc. v. United States Department of Agriculture*, 275 F.3d 432 (5th Cir. 2001)—Foster Farms contends that federal law authorizes poultry processors to sell raw chicken containing Salmonella because Salmonella is not under any circumstance an adulterant within these statutory definitions. Foster Farms interprets these cases too broadly, however.

The plaintiffs in *Butz* sued to enjoin the Secretary of Agriculture from allegedly misbranding meat and poultry. 511 F.3d at 331-32. "Specifically, they alleged that the Secretary was wrongfully refusing to affix to meat and poultry products, inspected by the Department of Agriculture, labels containing handling and preparation instructions to protect the consumer against food poisoning caused by salmonellae and other bacteria." *Id.* In determining whether the label "inspected for wholesomeness," which the court deemed synonymous with "inspected and not adulterated," was false or misleading when affixed to meat and poultry containing Salmonella, the court considered whether the presence of Salmonella on these products rendered them adulterated under federal law. The court reasoned that "the presence of salmonellae in meat does not constitute adulteration" as that term is defined in 21 U.S.C. § 453(g) because the bacteria "may be inherent in the meat" and proper cooking and handling of poultry "do[es] not ordinarily result in salmonellosis." *Id.* at 334-35. Importantly, however, the court analyzed only § 453(g)(1)'s definition of adulterated and whether salmonella, as a "substance that is not an added substance," would in any amount "ordinarily render it injurious to health." *Id.* The court did not analyze or otherwise explain why Salmonella on raw chicken could not satisfy any of the other statutory definitions.[3]

In *Supreme Beef,* a plaintiff meat processor claimed that the USDA exceeded its

---
[3] A different panel of the same court, this time considering whether Salmonella may be deemed an adulterant on raw shrimp, both distinguished the "legal and factual context" of *Butz*, and criticized the court's conclusion that Salmonella on raw meat and poultry is not an adulterant. *Cont'l Seafoods, Inc., v. Schweiker*, 674 F.2d 38, 41 (D.C. Cir. 1982) ("The court offered no evidentiary support for its additional suggestion that salmonella may not be 'added' to meat.").

- 7 -

authority under the Federal Meat Inspection Act ("FMIA")—which is materially identical to the PPIA, but covers processors of "cattle, sheep, swine, goats, horses, mules, and other equines" instead of poultry, 21 U.S.C. § 608—by using Salmonella tests to evaluate compliance with sanitation standards. 275 F.3d at 434-45. Citing *Butz* favorably, the court explained that:

> Salmonella, present in a substantial portion of meat and poultry products, is not an adulterant per se, meaning its presence does not require the USDA to refuse to stamp such meat "inspected and passed." This is because normal cooking practices for meat and poultry destroy the Salmonella organism, and therefore the presence of Salmonella in meat products does not render them "injurious to health" for purposes of § 601(m)(1).[4] Salmonella-infected beef is thus routinely labeled "inspected and passed" by USDA inspectors and is legal to sell to the consumer.

*Id.* at 438-39.

The court noted, however, that § 601(m)(4), which provides that meat may be adulterated if produced "under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health," is broader than the definition of adulterated in § 601(m)(1). *Id.* at 438. The USDA argued that "Salmonella levels can be a proxy for the presence or absence of means of pathogen controls that are required for sanitary conditions under § 601(m)." *Id.* at 439. Stated differently, the presence of high levels of Salmonella may permit an inference that a processor's conditions are insanitary and not adequate to control substances that are deemed adulterants. The court therefore framed the questions before it as follows:

> a) whether the statute allows the USDA to regulate characteristics of raw materials that are "prepared, packed or held" at the plants, such as Salmonella infection; and b) whether § 601(m)(4)'s "insanitary conditions" such that product "may have been rendered injurious to health" includes the presence of Salmonella-infected beef in a plant or the increased likelihood of cross-contamination with Salmonella that results from grinding such infected beef.

*Id.*

---

[4] Section 601(m) of the FMIA is materially identical to § 453(g) of the PPIA.

The court answered both questions in the negative. On the first, the court concluded that the USDA cannot regulate the Salmonella levels of incoming meat because the use of the word "rendered" in § 601(m)(4):

> indicates that a deleterious change in the product must occur while it is being "prepared, packed or held" owing to insanitary conditions. Thus, a characteristic of the raw materials that exists before the product is "prepared, packed or held" . . . cannot be regulated by the USDA under § 601(m)(4).

*Id.* at 440. That is, because Salmonella is natural to the animal, its presence on raw meat in and of itself cannot be indicative of insanitary processing. Indeed, the plaintiff had argued that it failed to satisfy the USDA's Salmonella performance standards "because it purchased beef 'trimmings' that had higher levels of Salmonella than other cuts of meat." *Id.* at 441. By using potentially naturally-occurring Salmonella levels as a proxy for insanitary conditions under § 601(m)(4), the court reasoned that the USDA was improperly "regulating the procurement of raw materials" rather than processing conditions. *Id.* As for the second question, the court concluded that "[c]ross-contamination of Salmonella alone cannot form the basis of a determination that a plant's products are § 601(m)(4) adulterated, because Salmonella itself does not render a product 'injurious to health' for purposes of both §§ 601(m)(1) and 601(m)(4)." *Id.* at 442-43.

Both *Butz* and *Supreme Beef* support Foster Farms' argument. Indeed, the Court is aware of no case finding that Salmonella on raw meat or poultry renders the products adulterated within the meaning of the PPIA or FMIA.[5] But neither *Butz* nor *Supreme Beef* are preemption cases, nor did they involve claims brought by injured consumers against a poultry or meat processor. Moreover, neither case analyzed § 453(g)(3)'s definition of adulterated, and neither squarely held that Salmonella on raw meat or poultry can never, under any circumstance, be deemed an adulterant under any statutory definition. To the contrary, *Supreme Beef* interpreted *Butz* as concluding that Salmonella

---

[5] The court in *Continental Seafoods* concluded that Salmonella on raw *shrimp* may render the product injurious to health. 674 F.2d at 44.

- 9 -

is not an adulterant *per se*, and went on to conclude that the presence of Salmonella *in and of itself* does not render a product injurious to health. The Court therefore does not read these cases as foreclosing the USDA from treating Salmonella as an adulterant under different and otherwise appropriate circumstances.

Given these distinctions, the Court finds more instructive a notice issued by the USDA in December 2012 informing producers of raw ground chicken and turkey products that they must reassess their Hazard Analysis and Critical Control Point ("HACCP") plans "to take account of several recent Salmonella outbreaks[.]"[6] *HAACP Plan Reassessment for Not-Ready-To-Eat Comminuted Poultry Products and Related Agency Verification Procedures Notice*, 77 Fed. Reg. 72686-01 (Dec. 6, 2012)*, available at* 2012 WL 6043195. In that notice, the USDA offered guidance to poultry processors regarding the circumstances under which the agency might deem a product associated with an illness outbreak to be adulterated:

> *When [not-ready-to-eat ("NRTE")] poultry or meat products are associated with an illness outbreak and contain pathogens that are not considered adulterants, [the Food Safety Inspection Service ("FSIS")] likely will consider the product linked to the illness outbreak to be adulterated under 21 U.S.C. 453(g)(3) or 21 U.S.C. 601(m)(3) because the product is "* * * unsound, unhealthful, unwholesome, or otherwise unfit for human food."* In such cases, the Agency would request that the establishment recall the product if it is still in commerce.
>
> *FSIS will also evaluate whether the particular product associated with the illness outbreak may also be adulterated because it was "* * *prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health" (21 U.S.C. 453(g)(4) or 21 U.S.C. 601(m)(4)). FSIS would likely find that such product is adulterated because it was produced under insanitary conditions where the establishment produced the product of concern under conditions that did not adequately address control of the pathogen in the product associated with the illness.*
>
> *The Agency would also likely determine the insanitary conditions to be continuing in the establishment until the*

---

[6] A HACCP is "a plan for reducing and controlling harmful bacteria on raw meat and poultry products." *Supreme Beef*, 275 F.3d at 435.

> establishment demonstrates that it has regained control of its production processes and re-established sanitary conditions under which the product is produced so that the establishment is able to produce unadulterated product.
>
> FSIS would also have to evaluate whether the type of product produced at other establishments, when demonstrably linked to product associated with the outbreak, is adulterated because it was produced under substantially similar processes and insanitary conditions. For example, associated product at another establishment produced from birds that came from the same grow-out house as the birds that were the source of the product associated with the illness outbreak, and that were subject to substantially similar processing conditions, may also be determined to be adulterated by the Agency.
>
> *FSIS would not be likely, however, to consider product of the same type adulterated though it is found to have the pathogen associated with the illness outbreak, provided it was produced in other establishments that have no relationship to product involved in the illness outbreak. A determination of adulteration would be specific to the product linked to the illness outbreak and to the conditions in the establishment where that product was produced.*

*Id.* (emphasis added). It appears, then, that although Salmonella is not ordinarily considered an adulterant, the USDA will treat it as such—under either or both §§ 453(g)(3) and (4)—when the bacteria are present on products associated with an illness outbreak, which is the situation the Court confronts here.

Indeed, the Cratens provide evidence that in 2013 the USDA issued Notices of Intended Enforcement ("NOIE") to the three California Foster Farms facilities associated with the outbreak.[7] (Doc. 181-6 at 135-149.) According to these notices, the USDA determined that Foster Farms' California facilities "fail[ed] to operate in a manner that is consistent with the requirements of the [HACCP] plan, Sanitation Standard Operative Procedures (SSOP) program, and Sanitation Performance Standards (SPS) regulations," as "evidenced by the fact that multiple poultry products produced by your establishment have been implicated in an ongoing illness or outbreak for Salmonella Heidelberg, a pathogen of human health concern." (*Id.* at 135, 140, 145.) The notices also informed

---

[7] A NOIE is a warning that alerts a poultry or meat processor that there is a basis for the USDA to withhold approval of its products unless corrective measures are taken.

Foster Farms that the USDA intended "to withhold the marks of inspection and suspend the assignment of inspectors" at the three California facilities unless corrective measures were taken. (*Id.* at 138, 143-44, 148-49.) If, as Foster Farms argues, "selling raw chicken with Salmonella does not violate the PPIA," (Doc. 193 at 10), it is not clear why the USDA would have threated to withhold marks of inspection and suspend the assignment of inspectors at the three Foster Farms facilities associated with the Salmonella Heidelberg outbreak.

For this reason, the Court finds equally unconvincing Foster Farms' argument that the Cratens cannot seek a jury determination that the chicken products associated with the Foster Farms outbreak were produced under insanitary conditions. Foster Farms argues that "[a] jury does not have jurisdiction to determine whether an allegedly contaminated product was processed during unsanitary conditions," and that "the PPIA preempts such a finding, which would invade the province of FSIS." (Doc. 193 at 9.) But a jury would not have to "invade the province of FSIS" to find for the Cratens; the NOIEs issued by the USDA demonstrate that the agency reached a similar conclusion and was prepared to withhold marks of inspection and suspend the assignment of inspectors unless corrective measures were taken.

In sum, the Court is not persuaded in the specific context of this case that liability cannot attach to a poultry producer selling products contaminated with Salmonella when those products are associated with an illness outbreak. Though the scant case law that exists suggests that Salmonella on raw poultry is not an adulterant *per se*, and that its mere presence does not *in and of itself* show that a product was produced under insanitary conditions, these cases do not entirely foreclose the possibility that Salmonella may be deemed an adulterant under the PPIA when products contaminated with the bacteria are associated with an illness outbreak. If, as the NOIEs suggest, the USDA could and would withhold marks of inspection and suspend the assignment of inspectors to the Foster Farms facilities associated with the Salmonella Heidelberg outbreak, Arizona law may hold Foster Farms liable and provide the Cratens with a damages remedy for conduct that

parallels the violations referenced in the NOIEs.

### ii. Warning and Labeling Requirements

The PPIA grants the Secretary of Agriculture authority to regulate the marking, labeling, and packaging of poultry products sold in the United States. 21 U.S.C. §§ 453, 457. Pursuant to that authority, the USDA has promulgated regulations on the label approval process. "No final label may be used on any product unless the label has been submitted for approval to the FSIS Labeling and Program Delivery Staff . . . and approved by such staff." 9 C.F.R. § 412.1(a). This requirement extends to "special statements and claims," which includes "instructional or disclaimer statements concerning pathogens." 9 C.F.R. § 412.1(c), (d). All Foster Farms raw chicken products produced during the relevant time frame contained instructions and warnings dictated by the FSIS.

Nonetheless, the Cratens allege that Foster Farms "knew, or should have known," that the chicken associated with the outbreak "did not provide adequate warnings of the danger and did not contain proper instructions for reasonably safe human consumption." (Doc. 223 ¶ 135.) Foster Farms contends that this claim is preempted by the PPIA because it seeks to impose marking and labeling requirements that add to or differ from those marks and labels approved and dictated by the FSIS, and the Court agrees. Because Foster Farms warning labels were both approved and mandated by the FSIS, the Cratens cannot challenge their adequacy under state tort law theories that would impose upon Foster Farms marking or labeling requirements different from or in addition to those preapproved by the federal government. Foster Farms therefore is entitled to summary judgment on Count II of the Amended Complaint.

### B. Causation

Foster Farms next argues that it is entitled to summary judgment on all claims because the Cratens cannot prove N.C.'s illness was caused by Foster Farms raw chicken products associated with the Salmonella Heidelberg outbreak. There certainly are reasons to doubt that N.C.'s illness was caused by Foster Farms products. As previously

noted, the Cratens admittedly do not know whether N.C. ate Foster Farms chicken in the days leading up to his illness. They reported that N.C. might have eaten any of several brands of chicken other than Foster Farms during the relevant time period, and that he ate a number of foods other than chicken that also can contain Salmonella. The Cratens' available shopping records from before the onset of N.C.'s illness reveal no purchases of raw Foster Farms chicken products. Moreover, in a questionnaire completed during an interview with N.C.'s parents shortly after N.C. became ill, the Maricopa County Health Department documented that the Cratens had denied eating Foster Farms chicken in the week prior to N.C.'s illness. (Doc. 137-16 at 7.) A jury hearing this evidence reasonably could find that N.C. did not contract salmonellosis from raw chicken associated with the Foster Farms outbreak. Indeed, the CDC cautioned that not all diagnoses of the Salmonella Heidelberg strains linked to Foster Farms necessarily were associated with the outbreak.

It does not follow, however, that a jury could not reasonably reach the opposite conclusion. Though the Cratens admittedly lack direct evidence that N.C. was exposed to Foster Farms chicken in the week before his illness, they provide sufficient circumstantial evidence to permit a jury to reasonably infer that N.C. more likely than not contracted his infection from raw chicken associated with the outbreak. For example, the Cratens offer reports from two expert witnesses, Kirk Smith and Edward Dudley, both of whom opine that N.C.'s illness likely was caused by Foster Farms raw chicken associated with the outbreak.[8] (Doc. 181-6 at 2-12.) Smith and Dudley reached their conclusions based on (1) the relatively rare strain of Salmonella Heidelberg that N.C. contracted, (2) the fact that N.C. contracted the illness in Arizona, which was the state with the second highest number of people affected by the Foster Farms outbreak, (3) the fact that N.C. became ill during the peak of the outbreak, and (4) the fact that the Cratens claimed to have

---

[8] In a footnote to its reply memorandum, Foster Farms "objects and moves to strike the expert declarations because they lack foundation and call for speculation." (Doc. 193 at 5 n.3.) Foster Farms does not develop this argument further. For purposes of this order, Foster Farms' motion to strike is denied.

- 14 -

purchased and consumed Foster Farms products in the past, even though they could not recall whether they did so in the week leading up to N.C.'s illness. (*Id.*)

Foster Farms' argument fails to appreciate that the Cratens need not prove conclusively that N.C.'s illness was caused by Foster Farms raw chicken associated with the outbreak. Instead, under the preponderance of the evidence standard, the Cratens need only convince a jury that it is more likely than not that Foster Farms was the source. Viewing the facts in the light most favorable to the Cratens, a jury reasonably could draw that inference based on the circumstantial evidence in the record and the opinions of the Cratens' expert witnesses.

## C. Strict Liability and Breach of Implied Warranty Claims

In the alternative, Foster Farms argues that it is entitled to partial summary judgment on Counts I (Strict Liability – Manufacturing Defect) and III (Breach of Implied Warranty of Merchantability).[9] Foster Farms argues that it cannot be held strictly liable for selling raw chicken containing Salmonella because Salmonella is natural to chicken and courts in other jurisdictions routinely have refused to permit strict liability based on substances found naturally in food. (Doc. 193 at 11 (citing cases).) In a similar vein, Foster Farms argues that the Cratens' breach of implied warranty claim fails as a matter of law because Foster Farms' raw chicken is safe when properly cooked and handled, and because no reasonable consumer believes that raw chicken is safe for consumption. (Doc. 137 at 14-15.) The Court agrees.

Under Arizona law, a merchant impliedly warrants that its products are "fit for the ordinary purposes for which such goods are used." *Dietz v. Waller*, 685 P.2d 744, 748-49 (Ariz. 1984); A.R.S. § 47-2314. Arizona law also provides that the seller of a product "in a defective condition unreasonably dangerous to the user or consumer is subject to strict liability in tort for physical harm or property damage caused thereby" provided that the

---

[9] Foster Farms also argues that it is entitled to partial summary judgment on Count II (Strict Liability – Failure to Warn). The Court has concluded, however, that Count II is preempted by the PPIA. The Court therefore does not reach Foster Farms' alternative arguments as to this claim.

- 15 -

plaintiff proves the "product is defective and unreasonably dangerous, the defect existed at the time it left defendant's control, and the defect is a proximate cause of" the plaintiff's injuries. *Menendez v. Paddock Pool Constr. Co.*, 836 P.2d 968, 971 (Ariz. Ct. App. 1991). In applying this doctrine, Arizona follows the Restatement (Second) of Torts ("Restatement") and treats the comments thereto as instructive. *See Scheller v. Wilson Certified Foods, Inc.*, 559 P.2d 1074, 1076-77 (Ariz. Ct. App. 1976). Comment i to the Restatement offers guidance on the proper interpretation of "unreasonably dangerous:"

> The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm . . . . The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

In applying these principles, the Court finds two cases cited by Foster Farms persuasive. The first is *Mexicali Rose v. Superior Court*, 822 P.2d 1292 (Cal. 1992), in which the California Supreme Court addressed the circumstances under which strict liability and breach of implied warranty claims may be premised on the presence of a substance naturally occurring in food. After surveying a number of jurisdictions, the California Supreme Court characterized the prevailing trend as follows:

> [T]he trend developing in courts recently considering the issue whether a plaintiff may recover for injuries caused by a natural or foreign substance can be summarized as follows: If the injury-producing substance is natural to the preparation of the food served, it can be said that it was reasonably expected by its very nature and the food cannot be determined to be unfit for human consumption or defective. . . . Thus, a plaintiff in such a case has no cause of action in implied warranty or strict liability. The expectations of the consumer do not, however, negate a defendant's duty to exercise reasonable care in the preparation and service of the food. Therefore, if the presence of the natural substance is due to a defendant's failure to exercise due care in the preparation of the food, an injured plaintiff may state a cause of action in negligence. By contrast, if the substance is foreign to the food served, then a trier of fact additionally must determine whether its presence (i) could reasonably be expected by the

> average consumer and (ii) rendered the food unfit for human consumption or defective under the theories of the implied warranty of merchantability or strict liability.

*Mexicali*, 822 P.2d at 630-31. The court adopted this framework, finding that it comports both with California law and with the Restatement, which Arizona follows.

The second is *Scheller*, a decision in which the Arizona Supreme Court addressed "whether the doctrine of strict liability should be applied against a defendant wholesale meat packer who sells fresh raw pork containing trichina larvae."[10] 559 P.2d at 1075. The court explained:

> The immediate and obvious problem with defining the pork as defective or unreasonably dangerous is that the pork was sold by [the defendant], and purchased by . . . the plaintiff, with the understanding by all concerned that it was to be properly cooked before it was consumed. Not only is it common knowledge that pork is not to be eaten raw, but in addition there was testimony that the [plaintiffs] . . . and [the defendant] all knew that in order to kill any trichina larvae and eliminate the danger of trichinosis, pork products had to be cooked thoroughly before they were eaten.

*Id.* at 1077. The court therefore concluded that the pork was not defective or unreasonably dangerous, and the defendant meat packer could not be held strictly liable.

Applying these lessons to this case, the Court concludes that the Cratens' strict liability and breach of implied warranty claims fail as a matter of law. It is undisputed that Salmonella occurs naturally in chicken and that the bacteria are killed through proper cooking. Nor is there a genuine dispute that the Cratens were aware of the dangers of cross-contamination if raw chicken is improperly handled, and that raw or undercooked chicken is unsafe for consumption. The raw chicken associated with the Foster Farms outbreak therefore was not defective or unreasonably dangerous under Arizona law because Salmonella is killed through proper cooking, which is how raw chicken products

---

[10] The plaintiff in *Scheller* had also pursued an implied warranty claim below, but argued only strict liability before the Arizona Supreme Court because "the theory of liability under implied warranty ha[d] been merged into the doctrine of strict liability in tort[.]" 559 P.2d at 1076. Accordingly, the Court finds the *Scheller* decision instructive on the Cratens' implied warranty claim, as well.

- 17 -

are intended to be used. Foster Farms may be held liable for negligence in the processing of its raw chicken products, but it may not be held strictly liable, nor can it be said that its products are unfit when properly prepared and handled.

Indeed, a contrary result would run afoul of the PPIA's express preemption provision because strict liability applies even where "the seller has exercised all possible care in the preparation and sale of his product[.]" Restatement § 420A. As previously noted, the prevailing legal view is that Salmonella is not, in and of itself, an adulterant under the PPIA. Therefore, a poultry processor does not violate the PPIA simply by selling raw chicken containing Salmonella. Instead, on a case-by-case basis the USDA may deem raw chicken contaminated with Salmonella to be adulterated when it is linked to an illness outbreak. The USDA has expressly cautioned that "determination of adulteration would be specific to the product linked to the illness outbreak and to the conditions in the establishment where that product was produced." *HAACP Plan Reassessment*, 77 Fed. Reg. 72686-01. To hold Foster Farms strictly liable for selling raw chicken contaminated with Salmonella, regardless of whether it had exercised all possible care, could functionally prohibit Foster Farms from doing that which the PPIA allows it to do. The Court therefore grants summary judgment for Foster Farms on Counts I and III.

**IV. Conclusion**

For the foregoing reasons, the Court finds that the Cratens' failure to warn claim is preempted by the PPIA, and that their strict products liability and implied warranty claims fail as a matter of law because Salmonella is natural to poultry, killed through proper cooking, and because no poultry processor or reasonable consumer expects raw, improperly cooked, or improperly handled chicken to be safe for consumption. The Court denies summary judgment on the Cratens' negligence claims, however, because they are not preempted under the facts and circumstances of this case, and a jury reasonably could find that N.C.'s illness was more likely than not caused by raw chicken products implicated in the Salmonella Heidelberg outbreak.

**IT IS ORDERED** that Foster Farms' Motion for Summary Judgment (Doc. 137) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Summary judgment is granted in favor of Foster Farms on Counts I, II, and III of the Amended Complaint.

2. Summary judgment is denied on Counts IV and V to the extent those claims are based on duties that parallel the requirements imposed upon poultry processors by the PPIA.

Dated this 19th day of January, 2018.

Douglas L. Rayes
United States District Judge